IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ACTIVE MEDICAL, INC., Plaintiff, | No. 1:25cv851 |
| | (Judge Munley) |
| v. | |
| DAVID LESZCZYK; LINA MEDICAL USA, INC., Defendants. | |

## MEMORANDUM

In January 2025, Defendant David Leszczyk, a salesperson employed by Plaintiff Active Medical, Inc., resigned his position and began employment with Defendant LiNA Medical USA, Inc., a customer of plaintiff. Shortly thereafter, LiNA terminated its relationship with plaintiff. On May 14, 2025, plaintiff filed this action asserting state law claims against Leszczyk and LiNA related to those events. (Doc. 1). Before the court are motions to dismiss brought by the defendants pursuant to the doctrine of *forum non conveniens* and Federal Rule of Civil Procedure 12(b)(6). (See Docs. 14, 29).

**Factual Background**

When considering motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), facts alleged in plaintiff's complaint are taken as true. Trzaska v. L'Oreal USA, Inc., 865 F.3d 155, 162 (3d Cir. 2017).

To comply with this standard, the court recites the factual background nearly verbatim as to that stated in plaintiff's complaint. (See Doc. 1). No imprimatur of the court as to its veracity is given or should be inferred.

## I. Leszczyk's Employment Relationship with Active

As alleged in the complaint, Active received and processed Leszczyk's application for employment in Pennsylvania. (Doc. 1 ¶ 19). Active employed Leszczyk from July 9, 2018, until January 21, 2025. Id. ¶ 20. Initially, Active employed Leszczyk as a sales representative. Id. ¶ 21. Upon achieving a particular level of success in that role, Active promoted Leszczyk to Senior Sales Representative. Id. Leszczyk's employment generally involved, among other things, educating healthcare providers on Active's product offerings, covering cases involving hysteroscopy, sling placement, laparoscopic cholecystectomy, and vascular access, and marketing, distributing, and selling medical products and supplies. Id. ¶ 22. In addition, Leszczyk's primary duties included providing product representation, developing and maintaining customers, engaging in sales activities, including making personal contacts and sales calls with the goal of increasing sales of assigned products, and providing consumer awareness for the assigned products. Id. ¶ 23. As part of his employment with Active, Leszczyk was entrusted with developing valuable relationships by virtue of his employment and accessing valuable confidential and proprietary information and

trade secrets belonging to Active and its customers, target customers, manufacturers, and suppliers. Id. ¶ 24.

Prior to his employment with Active, Leszczyk was employed at a uniform supply company and had no experience in medical equipment sales. Id. ¶ 25. During his employment with Active, Active provided Leszczyk with extensive sales training—which lasted between twelve and eighteen months—through Active and multiple manufacturers represented by Active, including but not limited to, Therogenics University, Neomedic, and Uresil. Id. ¶ 26. Specifically, Active provided Leszczyk with intensive training on the basics of medical equipment sales, including training on how to navigate hospitals, approach physicians and clinicians, and understand different specialties. Id. ¶ 27. Further, Leszczyk participated in quarterly and semi-annual meetings that involved intensive training. Id. ¶ 28. Active also paid for Leszczyk to travel to multiple manufacturers and undergo multi-day on-location trainings. Id. ¶ 29.

Because Leszczyk lacked prior experience in medical equipment sales, his training required a greater investment of time and resources than would have been necessary for a candidate with relevant experience, resulting in significantly higher costs to Active. Id. ¶ 30. Through the specialized training, resources, and experiences that were provided by Active during the course of Leszczyk's

employment, Leszczyk acquired substantial knowledge, skills, and expertise in medical equipment sales. Id. ¶ 31.

In conjunction with Leszczyk's employment, Active and Leszczyk entered into an employment agreement, dated July 9, 2018. Id. ¶ 32. Active prepared, negotiated, and executed the agreement in Pennsylvania. Id. ¶ 33. Active compensated Leszczyk with a salary, which started at $62,500 per year and eventually was increased to $80,000 per year, plus quarterly bonuses and participation in Active's commission/bonus program. Id. ¶ 35. Leszczyk earned $25,000 and $17,500 in quarterly bonuses in 2023 and 2024, respectively. Id. ¶ 36. Leszczyk earned $28,777.64 and $16,391 in Senior Sales Representative Bonus payments in 2023 and 2024, respectively. Id. ¶ 37.

In 2023, Leszczyk brought in $258,086 in gross profit to Active. Id. ¶ 50. In 2024, Leszczyk brought in $247,639 in gross profit to Active. Id. ¶ 51.

Leszczyk reported to Jim Delaney, President, and John Anthony, Executive Vice President, both of whom are based in Pennsylvania. Id. ¶ 52. Throughout his employment with Active, Leszczyk traveled to Pennsylvania at least once per year for meetings and trainings. Id. ¶ 53. At the time he resigned, Leszczyk managed two employees who were based in Pennsylvania. Id. ¶ 54. Leszczyk traveled to Pennsylvania on at least two occasions for sales calls with

Pennsylvania-based employees to train those employees and support their sales efforts. Id. ¶ 55.

## II. LiNA's Contractual Relationship with Active

On January 18, 2021, Active entered into a partnership agreement with LiNA. Id. ¶ 56. Active negotiated and executed the agreement in Pennsylvania. Id. ¶ 58. On multiple occasions, members of LiNA management traveled to Pennsylvania to meet with Active in matters relating to the LiNA-Active partnership. Id. ¶ 59.

During his employment with Active, Leszczyk was responsible for selling LiNA's products, including the LiNA OperaScope, for Active. Id. ¶ 65. In carrying out these duties, Active entrusted Leszczyk with Active's business relationship with LiNA and with Active's customers and potential customers. Id. ¶ 66.

In 2023, Active made $76,505 in gross profit as a direct result of Leszczyk's LiNA sales. Id. ¶ 67. In 2024, Active made $59,308 in gross profit as a direct result of Leszczyk's LiNA sales. Id. ¶ 68.

Active held multiple sales meetings where LiNA performed demonstrations on LiNA's product lines for Active's sales representatives, including Leszczyk. Id. ¶ 69. Leszczyk became well-versed in LiNA's product offerings as a result of the training provided by Active. Id. ¶ 70.

From the outset of LiNA's entry into the United States market in 2007, Active has been continuously engaged in representing and selling LiNA's products. Id. ¶ 71. At the end of 2018, the regions represented by Active ranked second and third, respectively, out of thirty-seven LiNA partners in OperaScope revenue. Id. ¶ 72. Active represented and sold the OperaScope for LiNA since its launch in 2018. Id. ¶ 74. In October 2024, Matt Johnson, Distributor Sales Manager for LiNA, informed Active that it was LiNA's top sales group and stated that he could not thank Active enough for its efforts. Id. ¶ 75. Thomas Crider, Market Development Specialist for LiNA, praised Active's Sales Representative Gary Martin on multiple occasions in October 2024. Id. ¶ 76.

In 2023, Active averaged $15,583 per month in profit as a direct result of the partnership agreement. Id. ¶ 77. In 2024, Active averaged $19,164 per month in profit as a direct result of the partnership agreement. Id. ¶ 78. In 2024, Active sold $287,955.50 worth of LiNA products in Pennsylvania and earned $57,591.10 in commission dollars from the sale of LiNA products in Pennsylvania. Id. ¶ 79. Active expected to bring in $275,000 in commission dollars in 2025 as a direct result of Active's existing customer relationships regarding the LiNA products. Id. ¶ 80. Active expected to close several new deals for LiNA products in 2025, including with the University of Pittsburgh Medical Center ("UPMC") and Novant. Id. ¶ 81. Specifically, Active and UPMC

expected to close a deal in early 2025 that would have been for the sale of 15,000 units of the LiNA Seastar, which would have brought Active approximately $150,000 commission dollars in 2025. Id. ¶ 82.

Active and Eastern Tennessee expected to close deals that would have resulted in over $33,900 in annual commission dollars. Id. ¶ 83. Active and Women's Health Partners, WakeMed, Cone Health, Atrium Charlotte OBGYN, and Novant expected to close deals for LiNA products that would have resulted in up to $68,000 annual commission dollars. Id. ¶ 84. Active and Bristol Medical Center were in the midst of an ongoing successful trial of the LiNA OperaScope that would have resulted in approximately $30,000 annual commission dollars. Id. ¶ 85. Active and Bristol Medical Center expected to ramp up supracervicals and morcellator, which would have resulted in increased commission dollars. Id. ¶ 86. Active and Jackson Madison Hospital were soon to start a trial period for the OperaScope that would have resulted in approximately $5,200 annual commission dollars. Id. ¶ 87. Active and Tennessee Surgery Center had completed a trial for LiNA's slings that would have resulted in approximately $5,200 annual commission dollars. Id. ¶ 87. Active and Tennessee Surgery Center had completed a trial for LiNA's slings that would have resulted in approximately $30,000 annual commission dollars. Id. ¶ 88. Active and several other providers, including but not limited to St. Francis Hospital-Bartlett, Dr.

Swan, Dr. Rowland, Dr. Todd, and Regional One OBGYN expected to close deals in 2025 that would have resulted in increased commission dollars. Id. ¶ 89. Active and Rutherford Hospital expected to close deals that would have resulted in $5,400 annual commission dollars. Id. ¶ 90. Active and Fort Sanders OBGYN expected to close a deal that would have resulted in $9,000 annual commission dollars. Id. ¶ 91. Active and Dr. Dizon expected to close a deal in 2025 that would have resulted in $4,600 annual commission dollars. Id. ¶ 92. Active and Dr. Childs expected to close a deal in 2025 for the LiNA Xcise and LiNA OperaScope that would have resulted in approximately $14,800 annual commission dollars. Id. ¶ 93. Active and Dr. Brunvoll expected to close a deal in 2025 that would have resulted in approximately $8,000 annual commission dollars. Id. ¶ 94. Active took steps toward closing deals for LiNA products in 2025 worth a total of more than $358,900 in annual commission dollars. Id. ¶ 95.

When Active disengaged from these pending deals, Active's potential customers were upset. Id. ¶ 119.

## III. Leszczyk's Resignation

On December 11, 2024, Mason Green, Head of Commercial at LiNA, sent an email to Leszczyk's Active email account, stating that LiNA was looking to hire a "Northeast specialist." Id. ¶ 96. On or about January 17, 2025, Leszczyk informed Active that he was leaving Active to work for LiNA directly via a phone

call to Tom Regan, Active's Vice President of Sales. Id. ¶ 97. During the call, Regan reminded Leszczyk of obligations set forth in the employment agreement, including restrictive covenants, and also informed Leszczyk of obligations set forth in a section of LiNA's partnership agreement. Id. ¶ 98.

On or about January 20, 2025, Leszczyk sent Regan a resignation letter via email. Id. ¶ 99. In that email, Leszczyk stated that, on December 13, 2024, Leszczyk had reached out to LiNA regarding its Market Development Specialist role, that he subsequently applied for the position, and that he intended to prioritize Active as a partner of LiNA in his new employment with LiNA. Id. ¶ 100. He thanked Regan for all of the opportunities given to him over the years. Id. ¶ 101. He stated "[f]rom riding along and teaching me in my early days at Active Medical, to mentoring me as a leader in my final days, you have been the most important factor in my development as a professional. For that I will be forever thankful." Id. ¶ 102.

Leszczyk's last day of employment with Active was January 21, 2025, and he was paid through January 23, 2025. Id. ¶ 103. Leszczyk is currently employed by LiNA. Id. ¶ 105.

Active engaged the services of a recruiter for Leszczyk's replacement, at the cost of $10,000. Id. ¶¶ 121–122. Active estimates the cost to interview,

onboard, and train Leszczyk's replacement at an additional $60,000. Id. ¶ 123. The new hire's credentialing will cost approximately $1,500. Id. ¶ 124.

On February 7, 2025, Active sent a cease-and-desist letter to Leszczyk, demanding that he cease and desist alleged violations of the employment agreement. Id. ¶ 126. Active has not received a response. Id. ¶ 127.

## IV. LiNA's Termination of the Partnership Agreement

On January 17, 2025, Active notified LiNA of Leszczyk's obligations under the employment agreement. Id. ¶ 106. Regan called Matt Johnson and Mason Green, to inform LiNA of Leszczyk's obligations. Id. ¶ 106. On January 22, 2025, LiNA sent Active a letter terminating the partnership agreement effective March 23, 2025. Id. ¶ 107. On February 7, 2025, Active sent a demand letter to LiNA, demanding that LiNA cease and desist all activities alleged to be in violation of the partnership agreement and/or that interfere with Leszczyk's contractual obligations to Active pursuant to the employment agreement. Id. ¶ 129. Active has not received a response from LiNA. Id. ¶ 130.

In addition to LiNA having been a partner to Active, LiNA is also a competitor of Active's. Id. ¶ 112. Active is not presently selling products that are directly competitive with LiNA solely because Active had been complying with Section 7(d) of the partnership agreement. Id. ¶ 113. Active is in discussions to replace the gap left by the loss of LiNA's product lines with competitive products

in Active's offerings, including the Blue Endo Laparoscopic Power Morcellator. Id. ¶ 117.

## V. Active's Claims

On these facts, Active brings one count of breach of contract, one count of breach of the duty of loyalty, and one count of tortious interference with existing contractual relations against Leszczyk. Id. at 24–28. Active brings one count of tortious interference with prospective contractual relations and one count of conspiracy against both defendants. Id. at 29–30, 34–35. Active brings one count of tortious interference with contractual relations and one count of breach of contract against LiNA. Id. at 30–34.

## Jurisdiction

Active is a citizen of Pennsylvania, Leszczyk is a citizen of New Jersey, and LiNA is a citizen of Georgia. (Doc. 1 ¶ 12). Active claims damages exceeding $75,000. Jurisdiction is thus premised on the diversity of the parties. 28 U.S.C. § 1332(a)(1).

## Discussion

## I. LiNA's Motion to Dismiss

LiNA moves to dismiss pursuant to the doctrine of *forum non conveniens*, or, in the alternative, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 14 at 1).

The partnership agreement between Active and LiNA states:

> 20. Governing Law Both Parties agree and stipulate that any dispute, controversy, lawsuit or claim arising out of or in connection with this Agreement, or the breach, termination, or invalidity thereof, shall be governed only by the laws of the State of Georgia without giving effect to principles of conflict of laws. Both parties stipulate and agree that venue for any and all trial proceedings shall only be in the State or Superior Court of Cobb County, Georgia, USA.

(Doc. 1-1 at 20).

LiNA argues that the court should enforce this forum selection clause and dismiss the claims against it so that they may be pursued in an agreed-upon venue. (Doc. 15 at 11–17).

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." Atl. Marine Constr. Co. v. U.S. Dist. Ct., 571 U.S. 49, 61 (2013). When "the parties' contract contains a valid forum-selection clause," it represents their "agreement as to the most proper forum." Id. at 63 (quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 31 (1988)). And so, it "should be given controlling weight in all but the most exceptional cases." Id. (quoting Stewart Org., 487 U.S. at 33). Those exceptional cases arise when public, rather than private, interest demands that the case remain in plaintiff's chosen forum. Id. at 62–65 & n.6.

In that spirit, Active first argues that it would be "unreasonable and unjust" to enforce the forum selection clause because not all of its claims are covered by

the clause, as they do not all "arise out of the contractual relationship or implicate the Partnership Agreement's terms." (Doc. 23 at 14). The court disagrees with that position.

The court interprets the forum selection clause under Pennsylvania substantive law. Collins v. Mary Kay, Inc., 874 F.3d 176, 182–83 (3d Cir. 2017). Under that law, a contract "should be read as a whole . . . to give effect to its true purpose." MBC Dev. LP v. Miller, 316 A.3d 51, 69 (3d Cir. 2024) (citation modified). Doing so here, the court understands that the "trial proceedings" implicated by the forum selection clause refer to "claim[s] arising out of or in connection with this Agreement, or the breach, termination, or invalidity thereof," as stated in the "Governing Law" clause. (See Doc. 1-1 at 20). This mirrors Pennsylvania law, where "pleading non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms." Autochoice Unlimited, Inc. v. Avangard Auto Fin., Inc., 9 A.3d 1207, 1212 (Pa. Super. Ct. 2010) (citation omitted).

Active's tortious interference with prospective contractual relationships claim contemplates the loss of business attributable to the partnership agreement. (Doc. 1 ¶ 163). So, it clearly arises out of that relationship. Active's breach of contract claim against LiNA alleges that LiNA breached the partnership

agreement by soliciting Leszczyk for employment. (E.g., id. ¶¶ 189–191). The conspiracy claim alleges "Leszczyk and LiNA acted in concert to unlawfully breach the Employment Agreement and the Partnership Agreement," necessarily implicating the same. Id. ¶ 197.

The only claim that does not explicitly refer to the partnership agreement is tortious interference with Leszczyk's employment contract. But in the complaint, Active states, "Upon information and belief, LiNA would not have terminated the Partnership Agreement if Leszczyk had not been solicited, induced, and/or encouraged to leave his employment with Active to join LiNA." (Doc. 1 ¶ 109). The claim therefore arises out of Active and LiNA's contractual relationship and implicates its terms. The forum selection clause, therefore, embraces all claims against LiNA.

Active next argues that enforcing the forum selection clause "would frustrate the public interest in allowing local courts to preside over localized controversies, as recognized by the Supreme Court in [Atlantic Marine]." (Doc. 23 at 14). But the court is not persuaded that the mere presence of plaintiff in Pennsylvania makes this dispute a localized one. And there is nothing peculiar to Pennsylvania now as it pertains to this relationship that was not true or predictable when Active agreed to the forum selection clause. See Doc. 23 at

14–16 (noting headquarters in Pennsylvania, as well as negotiation and execution of the agreement, meetings and sales in Pennsylvania).

Finally, the court sees no issue with permitting the parallel proceedings Active warns about in relation to the two overlapping claims—tortious interference and conspiracy. (Doc. 23 at 16). As LiNA argues, the situation alleged in this complaint (solicitation of an employee leading to the breach of an employment agreement) is contemplated by the very terms of the partnership agreement Active is invoking. If Active wanted to ensure litigation related to breaches of the partnership agreement and its employment agreements were conducted in the same forum, it could have required such as part of the negotiation process. Active did not do so. Active agreed to the forum selection clause. This forum selection clause "may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact have been a critical factor in [the parties'] agreement to do business together in the first place." Atl. Marine, 571 U.S. at 66. To allow Active to hide behind this court's apron now rather than honor its agreement would frustrate, not forward, "the interest of justice." Id. Active's claims against LiNA will be dismissed without prejudice so that Active may seek its remedies in a Georgia court.

Because the court will dismiss the claims against LiNA under the doctrine of *forum non conveniens*, it need not consider LiNA's arguments that Active fails to plausibly state a claim for relief.

## II. Leszczyk's Motion to Dismiss

Leszczyk moves to dismiss all claims brought against him for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 29, 31).

### A. Standard of Review

The court tests the sufficiency of the complaint's allegations when considering a Rule 12(b)(6) motion. To survive a motion to dismiss, "a complaint must provide 'a short plain statement of the claim showing that the pleader is entitled to relief.'" Doe v. Princeton Univ., 30 F.4th 335, 341–42 (3d Cir. 2022) (quoting FED. R. CIV. P. 8(a)(2)). This means "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when factual content is pleaded which allows the court to draw the reasonable inference that the defendants are liable for the misconduct alleged. Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

The court evaluates motions to dismiss using a three-step process. The first step involves identifying the elements of each claim. Oldham v. Pa. State Univ., 138 F.4th 731, 743 (3d Cir. 2025). The second step involves reviewing the operative pleading and "disregarding any formulaic recitation of the elements of a claim or other legal conclusion, as well as allegations that are so threadbare or speculative that they fail to cross the line between the conclusory and factual." Lutz v. Portfolio Recovery Assocs., LLC, 49 F.4th 323, 328 (3d Cir. 2022) (citation modified). "The third step evaluates the plausibility of the remaining allegations." Id. In evaluating the plausibility of the plaintiff's allegations, the court accepts all factual allegations as true, construes the complaint in the light most favorable to plaintiff, and draws all reasonable inferences in plaintiff's favor. Id. (citations omitted).

**B. Breach of Contract**

Whether applying the governing law clause of Leszczyk's purported employment agreement, (Doc. 1-1 at 13), or the substantive law of the forum state, as the court ordinarily must in diversity cases, McGowan v. Univ. of Scranton, 759 F.2d 287, 290 (3d Cir. 1985) (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)), the result here is the same—the application of Pennsylvania

substantive law. In Pennsylvania, to state a claim for breach of contract, "a plaintiff must plead: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." Kane v. State Farm Fire & Cas. Co., 841 A.2d 1038, 1042 (Pa. Super. Ct. 2003) (citation omitted).

Leszczyk first argues that a contract with Active does not exist because the alleged contract "is not signed by Active nor is Leszczyk's signature thereon witnessed." (Doc. 31 at 9). But as Active argues, a contract is formed "[i]f the parties agree upon essential terms and intend them to be binding." Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999) (citation omitted). "As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." Id. (citations omitted). Leszczyk alerts the court to no law or other reason why a signature was required here.

Leszczyk also notes "egregious" problems—some discrepancies in page numbers and language in the addendum, (Doc. 31 at 9) —but fails to argue how such issues negate his intent to be bound by the contracts produced. The court is persuaded by Active's argument that the presence of Leszczyk's signature is ample support at the motion to dismiss stage to plead Leszczyk's intent to be bound by the agreements.

Leszczyk next argues that the restrictive covenants in the employment agreement cannot be enforced because they are not "designed to protect the legitimate interests of the employer." (Doc. 31 at 10 (citing Allegheny Clinic v. Conde-Colon, 350 A.3d 140 (Pa. Super. Ct. 2005) (table)). Leszczyk argues that Active had no legitimate interest because it is not selling products competitive with LiNA, does not have similar products to market, and "was only in discussions to replace the gap left by losing LiNA's product lines." (Doc. 31 at 10). But Leszczyk ignores the obvious. Active asserts that Leszczyk's breach caused it to lose its business with LiNA—an interest it legitimately sought to prevent with a covenant prohibiting Leszczyk to "solicit, sell, market or otherwise seek to represent any of the products being marketed by the Company at the time of Employee's termination." (Doc. 1-1 at 6).

Leszczyk next argues that Active fails to plead breach of contract because "[n]owhere in the Complaint is there an allegation that Leszczyk (a) disclosed or made use of Secret or Confidential Information, (b) directly or indirectly provided services to or was employed by a business in competition with Active in the Geographic Territory, (c) solicited or was representing products marketed by Active after termination of the Partnership Agreement, or (d) contacted, solicited, or (attempted to) divert(ed) Active's (potential) customers with whom Leszczyk had contact during his final 2 years of employment with Active relative to

products or services to or in competition with Active." (Doc. 31 at 11). But the "after termination of the Partnership Agreement" language comes from Leszczyk—not the employment agreement. As stated above, Active has sufficiently pleaded that Leszczyk marketed products for LiNA, which were being marketed by Active at the time of his termination, because he joined LiNA for the purpose of being their Northeast Specialist. (Doc. 1 ¶¶ 96–97). As such, they also pleaded that Leszczyk diverted LiNA from using Active to sell their goods to using Leszczyk. While Leszczyk maintains that he intended to help Active after his transition, at the motion to dismiss stage, Active receives all inferences in its favor. It is reasonable for the court to infer that Leszczyk was hired as a substitute for the services Active provided LiNA, which in turn would plausibly constitute Leszczyk's violation of the terms of the employment agreement. The motion to dismiss the breach of contract claim will be denied.

### C. Breach of Duty of Loyalty

To state a claim for the breach of fiduciary duty of loyalty, "a plaintiff must [allege] that his agent acted for a person or entity whose interests conflicted with the plaintiff." Reading Radio, Inc. v. Fink, 833 A.2d 199, 211 (2003) (citing RESTATEMENT (SECOND) OF AGENCY § 394 (1958)).

Leszczyk argues that the email he sent to Active demonstrates his intent "to continue to assist Active to grow its sales of LiNA's products after he became

employed by LiNA." (Doc. 31 at 11). But at this stage, inferences are in favor of Active. The court can infer from the facts pleaded that Leszczyk did not leave his employment with Active to join LiNA in the pursuit of Active's interests. And contrary to Leszczyk's argument, LiNA's ultimate termination of the partnership agreement does not vitiate any claim Active may have against Leszczyk, (see Doc. 31 at 14), because the alleged breach of Leszczyk's duty of loyalty preceded LiNA's partnership termination. The motion to dismiss this claim will be denied.

**D. Tortious Interference with Existing and Prospective Contracts**

"The four elements of a cause of action for intentional interference with contractual relations are as follows: (1) the existence of a contractual relationship; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship: (3) the absence of a privilege or justification for such interference. and (4) damages resulting from the defendant's conduct." Triffin v. Janssen, 626 A.2d 571, 574 (Pa. Super. Ct. 1993) (citation modified).

Again here, Leszczyk argues that his email to Active "makes clear that Leszczyk intended to continue to assist Active — and grow — its sales of LiNA products." (Doc. 13 at 13). But the email only makes clear that Leszczyk said those words—not that he meant them. According to the complaint, the email was

sent after Leszczyk was reminded of the provisions of his employment agreement. (Doc. 1 ¶¶ 97–100). The court can reasonably infer that Leszczyk sent the email to protect himself. And so, the court is not convinced that this "exhibit should control." (Doc. 31 at 14).

Leszczyk argues that he was not a party to the partnership agreement but does not explain why that matters. Id. Here again, Leszczyk invokes the ultimate termination of the partnership agreement, but apparently fails to understand that Active is alleging that Leszczyk's interference precipitated that termination. That LiNA had a contractual right to terminate the agreement does not negate the possibility that Leszczyk could have otherwise interfered with that relationship. Finally, Leszczyk resuscitates his argument that because Active was not and is not selling products comparable to LiNA, it has not pleaded damages. But Active is pleading the loss of its ability to sell LiNA products and Leszczyk as the reason for that loss. The motion to dismiss the tortious interference with contractual relationship claims will be denied.

### E. Conspiracy

To state a claim for civil conspiracy, "a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." Spinelli v. Fallon, 322 A.3d 956, 965 (Pa. Super. Ct. 2024) (citation modified).

Leszczyk appears to argue that because Active did not successfully state a claim for an unlawful act, the civil conspiracy claim must fail as a matter of law. (Doc. 31 at 15). But because the court held otherwise above, that argument cannot win the day. Additionally, Leszczyk argues "Active has nothing but conclusory allegations . . . that Leszczyk and LiNA acted in concert to breach the Employment Agreement and Partnership Agreement and agreed to inflict a wrong against or injury upon Active." Id. The court disagrees. Active has adequately pleaded facts from which this court can infer at the motion to dismiss stage that the pair acted in concert to subvert their respective contracts with the shared aim of creating a new business alliance. See Baker v. Rangos, 324 A.2d 498, 506 (Pa. Super. Ct. 1974) (plaintiff must "allege facts that if proved will support an inference of the combination and its intent"). The motion to dismiss the conspiracy claim will be denied.

**Conclusion**

For the reasons set forth above, Defendant LiNA Medical USA, Inc.'s motion to dismiss plaintiff's complaint, (Doc. 14), will be granted and the claims against that defendant will be dismissed without prejudice. Defendant David Leszczyk's motion to dismiss plaintiff's complaint, (Doc. 29), will be denied. An appropriate order follows.

Date: 9/17/26

JUDGE JULIA K. MUNLEY
United States District Court